UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

KIRK  DAVIS,                                   §
                                               §
          Plaintiff,                           §
VS.                                            §        CIVIL ACTION NO. 2:14-CV-38
                                               §
OWEN J MURRAY, *et al*,                        §
                                               §
          Defendants.                          §

## MEMORANDUM AND RECOMMENDATION
## ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In this prisoner civil rights action, Plaintiff Kirk Davis is suing Dr. Maximilliano Herrera, Avrian Mendez, a Physician's Assistant (PA), and Owen Murray, the Vice President of Offender Services, alleging that these individuals were deliberately indifferent to his serious medical needs following Plaintiff's September 13, 2011 slip and fall at the Garza East Unit.  Plaintiff claims also that PA Mendez retaliated against him when he reduced the dosage of one of Plaintiff's pain medications.

Defendants move for summary judgment to dismiss Plaintiff's claims arguing that they are entitled to qualified immunity.  (D.E. 95).  Plaintiff has filed a response in opposition.  (D.E. 103).

For the reasons stated herein, it is respectfully recommended that the Court grant summary judgment in Defendants' favor and that Plaintiff's claims against them be dismissed with prejudice.

## I.    JURISDICTION.

The Court has federal question jurisdiction over this civil rights action pursuant to 28 U.S.C. § 1331.

## II.    PROCEDURAL BACKGROUND.

Plaintiff is a prisoner in the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ-CID) and is currently housed at the Segovia Unit in Edinburg, Texas.

On February 5, 2014, Plaintiff filed his original complaint and alleged claims of unconstitutional conditions of confinement at the Garza East Unit in Beeville, Texas against TDCJ Executive Director Brad Livingston, and claims of deliberate indifference to his serious medical needs against Dr. Herrera, PA Mendez, and Mr. Murray, individuals who are employed by the University of Texas Medical Branch, Correctional Managed Care (UTMB-CMC).[1]   (D.E. 1, pp. 3, 6).   More specifically, Plaintiff complained that on September 13, 2011, he succumbed to heatstroke during lockdown causing him to fall, and that the medical attention he received thereafter was inadequate. (D.E. 1, p. 5).

---

[1] UTMB-CMC is the state agency that contracts with the TDCJ to provide medical services to offenders.

On March 26, 2014, a *Spears*[2] hearing was conducted, following which Plaintiff was granted leave to supplement his complaint to add as additional Defendants Garza East Unit Wardens Roger Pawelek and Ronald Givens.  (*See* D.E. 11, 13).

On March 13, 2014, service was ordered on the TDCJ Defendants and the UTMB-CMC Defendants through service on the Attorney General.  (D.E. 15).

On June 27, 2014, the UTMB-CMC Defendants filed a Partial Motion to Dismiss on the grounds that Plaintiff's claims against them were barred by the applicable 2-year statute of limitations.  (D.E. 24)

On July 7, 2014, the TDCJ Defendants filed a Motion to Dismiss on the grounds of limitations, no physical injury, mootness, and Eleventh Amendment immunity.  (D.E. 26).

On July 23, 2014, the TDCJ Defendants filed a "Notice of Potential Related Actions" (D.E. 34), reporting that Plaintiff is currently involved in three other civil rights actions, including one Multidistrict Litigation (MDL) in which a certified class of prisoner-plaintiffs, (or their assigns), are seeking damages for heat-related deaths and/or serious injury while in TDCJ custody.  *See In re Texas Prison Heat Litigation,* MDL Case No. 2569, before the United States Judicial Panel on Multidistrict Litigation.  (*See also* D.E. 34, 35, 36).

---

[2] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

On August 7, 2014, Plaintiff confirmed that he is involved in the prison heat MDL[3] and related also that he was having difficulty at the Segovia Unit such that he intended to file a § 1983 lawsuit to raise new claims against the Warden, Major, and Captain at that facility.  *Id.* at 1.  Plaintiff also filed a motion for a temporary restraining order (TRO) (D.E. 40) against the Segovia Unit personnel, but this request was denied without prejudice for lack of jurisdiction over the Segovia Unit individuals.  (*See* D.E. 44).

On November 17, 2014, Plaintiff filed an amended complaint and sought to add two additional individuals as defendants.  (D.E. 52).

On January 26, 2015, the undersigned entered an amended Memorandum and Recommendation (M&R) to deny Plaintiff's motion to amend complaint, to grant the TDCJ Defendants' motion to dismiss, and to deny the UTMB-CMC Defendants' motion to dismiss, save and except Plaintiff's claims for monetary damages against all Defendants in their official capacities as those claims are barred by the Eleventh Amendment.  (D.E. 58).

On March 26, 2015, the Court adopted the M&R, thus leaving only Plaintiff's Eighth Amendment claims against Dr. Herrera, PA Mendez and Mr. Murray in their individual capacities, as well as Plaintiff's retaliation claim against PA Mendez.  (D.E. 69).

---

[3] On October 9, 2014, the United States Judicial Panel on Multidistrict Litigation declined accept/centralize the Texas prison heat litigation in *In re Texas Prison Conditions-of-Confinement Litigation,* MDL No. 2569 (October 9, 2014).

On April 6, 2015, Plaintiff filed a notice of appeal of the Court's order adopting the M&R.[4]  (D.E.74).

On July 10, 2015, Defendants' filed the instant motion for summary judgment, with Exhibits A and C filed under seal.  (D.E. 95, 96).

On August 10, 2015, Plaintiff filed a response in opposition to Defendants' summary judgment motion.  (D.E. 103).

On August 17, 2015, Plaintiff filed a motion for continuance seeking to continue this action until after his December 2015 parole hearing with a possible answer by March of 2016 so that he may have additional time to gather evidence in support of his claims.  (D.E. 104).  On August 26, Plaintiff filed a letter motion for discovery.  (D.E. 105).  On September 2, 2015, Plaintiff's motion for a continuance, construed as a motion for a stay, as well as his motion for discovery, were denied without prejudice.  (D.E. 106).

## III.   SUMMARY JUDGMENT EVIDENCE.

In support of their motion for summary judgment, Defendants offers the following:

Ex. A:     Relevant portions of Plaintiff's medical records (D.E. 97-1, pp. 2-269);

Ex. B:     Relevant portions of Plaintiff's grievance records (D.E. 95-1, pp. 2-6); and

---

[4] The appeal was assigned Case No. 15-40449.

Ex. C:        Affidavit of Dr. Steven Bowers, Legal coordinator for UTMB-CMC
              (D.E. 97-2, pp. 2-12).

The summary judgment evidence establishes the following:

On September 13, 2011 at 8:54 p.m., Plaintiff arrived at the Garza Unit (GU) emergency room by wheelchair, having fallen at approximately 8:10 p.m.  (D.E. 97-1, pp. 3-11).  Plaintiff told the nursing staff that he was washing himself in the sink when he slipped on water on the floor and then fell, hitting his head on the sink, and then hitting his head on the floor when he fell to the ground.  (D.E. 97-1, p. 5).  Plaintiff related that he had a history of back surgery with rod placement and he complained of pain to his head and back.  *Id.*  Plaintiff also complained of feeling dizzy and nauseous and he was observed to vomit a small amount.  *Id.*  Plaintiff's vital signs and neurological symptoms were measured.  (D.E. 97-1, pp. 3-5).  PA Mendez was contacted and he ordered that Plaintiff be transported via ambulance to the local hospital for further evaluation, and that he be placed in a cervical collar during transport.  (D.E. 97-1, p. 5).

Plaintiff was taken to the emergency room at Christus Spohn Hospital in Beeville, Texas.  (D.E. 97-1, pp. 12-32).  The ER physician, Dr. Batki, identified Plaintiff's initial injuries as concussion with loss of consciousness (LOC), laceration to the head, and neck sprain/strain.  (D.E. 97-1, p. 12, 25).  Plaintiff told Dr. Batki that he was pouring water when he slipped and fell, and the next thing he remembered was waking up on the floor.  (D.E. 97-1, p. 28).  Dr. Batki could not assess how long Plaintiff might have been unconscious, but upon neurological examination, he found that Plaintiff had no impairments, but did suffer a large laceration to the back of his scalp.  (D.E. 97-1. p. 28).

Dr. Batki ordered a CT scan of Plaintiff's head and it was normal with no acute intracranial abnormality.  (D.E. 97-1, p. 32, 38).  Plaintiff reported the pain intensity of his head was a "10" on a scale of 0 to 10, with 10 being the worst pain imaginable.  (D.E. 97-1, p. 28).  Plaintiff was given an injection of Lidocaine before seven staples were administered as well as IV pain medication.  (D.E. 97-1, p. 31, 33).  Plaintiff was discharged back to the GU with instructions to have the staples removed in seven days, and prescribed Ibuprofen, 800 mg, every 8 hours, for pain.  (D.E. 97-1, p. 12).

On September 14, 2011, Plaintiff was seen in the GU infirmary following his return from Christus Spohn Hospital.  (D.E. 97-1, pp. 46-49).  Plaintiff was unable to verbalize what had happened to him the day before except to report that he had fallen and he had hit his head.  (D.E. 97-1, p. 46).  Plaintiff was aware that he had seven staples in the back of his scalp and reported his scalp pain to be a 10/10.  (D.E. 97-1, p. 46).  Plaintiff also complained of back pain from previous trauma due to lumbar level fusion and shoulder pain rating 8/10.  (D.E. 97-1, p. 46).  The nursing staff noted that Plaintiff's wound had no drainage or bleeding and that he had ambulated to medical without difficulty.  (D.E. 97-1, p. 46).  Upon examination, it was noted that Plaintiff was alert to time, place, and person and his respiration was equal and unlabored.  (D.E. 97-1, p. 46).  His bilateral hand grasp was strong as was his bilateral leg lifts.  (D.E. 97-1, p. 46).  His eye movements were intact and he was able to follow commands with no difficulty.  (D.E. 97-1, p. 46).  The plan was to have Plaintiff follow-up with a provider when present at the unit.  (D.E. 97-1, p. 46).

On September 15, 2011, Plaintiff was seen by Optometry.   (D.E. 97-1, p. 50).
Plaintiff was nearsighted and prescription eyeglasses were ordered.  *Id.*

On September 20, 2011, Plaintiff reported to the GU infirmary to have the staples
from his scalp removed.  (D.E. 97-1, pp. 51-53).  Plaintiff also complained of neck pain.
(D.E. 97-1, p. 53).  Upon examination, PA Mendez noted that Plaintiff had decreased
flexion and extension of the cervical spine.  (D.E. 97-1, p. 53).  However, the wound to
his scalp appeared well healed and the staples were removed with no redness or drainage.
(D.E. 97-1, p. 51, 53).  PA Mendez noted that Plaintiff's current medications were
Motrin, 600 mg, and Pamelor (Nortriptyline), both 50 mg and 75 mg.  (D.E. 97-1, p. 53).
PA Mendez added a muscle relaxant, Robaxin (Methocarbamol), 750 mg, 2 tablets a day.
(D.E. 97-1, p. 53).

On September 25, 2011, Plaintiff submitted a Sick Call Request (SCR)
complaining that he needed help with his head and back that were injured when he fell.
(D.E. 97-1, p. 55).  Notes indicate that Plaintiff was a "no show" for his scheduled
appointment on September 28, 2011.  (D.E. 97-1, p. 56)

On October 5, 2011, Plaintiff was evaluated for his Health Summary for
Classification form (HSM-18 form).  (D.E. 97-1, pp. 59-60).  Plaintiff had no restrictions
for his facility, housing, or row assignment.  (D.E. 97-1, p. 59).  However, he had the
following work restrictions: sedentary work only; excuse from school; no lifting over 20
pounds; no climbing; and limited sitting.  (D.E. 97-1, p. 59).

On October 13, 2011, Plaintiff received his prescription eyeglasses.  (D.E. 97-1, p.
58).

8 / 35

On October 22, and 27, 2011, Plaintiff submitted SCRs to see a provider regarding his neck and back pain.  (D.E. 97-1, p. 61).  He was scheduled to see a provider on October 28, 2011, but notes indicate that Plaintiff refused to attend this appointment. (D.E. 97-1, pp. 63-65).

On November 18, 2011, Plaintiff submitted a SCR seeking a refill for his Nortriptyline pain medication; however, he failed to show for his November 21, 2011 appointment.  (D.E. 97-1, pp. 67, 66).

On December 6, 2011, Plaintiff submitted a SCR complaining that his injuries from his September 13, 2011 fall were worse and that he needed to be seen by an orthopedic specialist.  (D.E. 97-1, p. 70).  Plaintiff failed to show for a December 7, 2011 scheduled appointment in response to this SCR.  (D.E. 97-1, p. 68).

On January 13, 2012, Plaintiff was seen in the GU infirmary for back pain and requests for pain medication.  (D.E. 97-1, pp. 73-74).  Upon examination, PA Mendez noted that Plaintiff had a large, well healed scar to his lumbar spine.  *Id.* at 73.  He had decreased flexion and pain at L-3.  *Id.*  PA Mendez prescribed Nortriptyline, 50 mg, for 30 days, with five refills.  *Id.*

On February 28, and March 8, 2012, Plaintiff submitted SCRs requesting that his Nortriptyline dosage be increased.  (D.E. 97-1, p. 87, 88).  Plaintiff was scheduled to be seen by a provider on March 20, 2012, but failed to show for that appointment.  *Id.,* p. 92.

On March 21, 2012, Plaintiff was seen by the nursing staff to evaluate his musculoskeletal symptoms.  (D.E. 91-1, pp. 94-99).  Plaintiff related that his back pain

was a 6/10 and he wanted his Nortriptyline increased from 50 mg to 125 mg.  (D.E. 97-1, p. 95, 97).  Plaintiff was referred to a provider for further evaluation.  *Id.* at p. 97.

On March 26, 2012, Plaintiff was seen by Mental Health Services (MHS).  (D.E. 97-1, pp. 102-103).  Plaintiff told the MHS provider that he did not have a mental health issue, but that he had chronic back pain, and that the Medical Department had decreased his Nortriptyline pain medication from 125 mg to 50 mg without explanation.  (D.E. 97-1, p. 102).  Plaintiff's complaint was referred back to medical.  (D.E. 97-1, p. 103).

On April 2, 2012, Plaintiff was seen by PA Mendez for continuing complaints about his back pain and his complaint that his pain medication was not strong enough.  (D.E. 97-1, pp. 116-121).  Upon examination, PA Mendez noted that Plaintiff had decreased range of motion in the lumbar spine.  (D.E. 97-1, p. 116).  PA Mendez discontinued the 50 mg Nortriptyline and prescribed 75 mg Nortriptyline for 11 months.  (D.E. 97-1, p. 117).  PA Mendez also prescribed Naproxen, 500 mg, once per day, for two months.  *Id.*

On April 4, 2012, Plaintiff submitted a SCR asking to see Dr. Wallace and stated that PA Mendez had "screwed up."  (D.E. 97-1, pp. 125-126).  Plaintiff maintained that he should receive 100 mg of Nortriptyline and 50 mg of Naproxen.  *Id.* at 126.

On April 12, 2012, Plaintiff was seen by Dr. Herrera for his complaints of "constant pain between shoulder blades, neck and lower back over 10 years."  (D.E. 97-1, pp. 131-32).  Dr. Herrera noted that Plaintiff had a previous lower back fusion and had ambulated to the appointment without assistance.  (D.E. 97-1, p. 131).  The examination was terminated without being completed because Dr. Herrera was "unable to exam"

Plaintiff properly due to lack of plaintiff's cooperation.  *Id.*  Dr. Herrera's assessment was degenerative disc disease and he confirmed the 75 mg dosage of Nortriptyline and 500 mg of Naproxen.  (D.E. 97-1, p. 135).

Plaintiff was scheduled to be seen at the GU infirmary on June 14, 2012 for evaluation of a refill on his Naproxen, but he failed to show for this appointment.  (D.E. 97-1, p. 151-153).

On September 18, 2012, Plaintiff reported to the GU infirmary requesting a Diet for Health (DFH) to help with his back pain.  (D.E. 97-1, p. 156).  PA Mendez found there was no indication for a DFH, and he denied the request.  *Id.*

On October 23, 2012, Plaintiff reported to the infirmary with complaints of pain in his lumbar spine due to the installed hardware.  (D.E. 97-1, pp. 162-63).  PA Mendez ordered x-rays of Plaintiff's thoracic and lumbar spine.  *Id.*  He also proscribed the muscle relaxant Robaxin (Methocarbamol) 750 mg twice a day for seven days.  (D.E. 97-1, p. 164).

On October 27, 2012, PA Mendez evaluated Plaintiff for his HSM-18 form.  (D.E. 97-1, pp. 160).  Plaintiff reported that his chronic lumbar back pain had improved and he requested that certain restrictions be dropped.  *Id.*  PA Mendez lifted Plaintiff's restrictions from sedentary work, excuse from school, and limited sitting.  *Id.*

By Radiology Report dated October 29, 2012, it was noted that Plaintiff had mild degenerative changes at the lower cervical and upper thoracic spine primarily in the form of anterior osteophytes.  (D.E. 97-1, p. 170).  The lumbar spine revealed bilateral rods and six radicular screws at L4 – S1 fusion.  *Id.*  No radiographic evidence of hardware

complications was observed.  *Id.*  Degenerative changes included subchondral sclerosis osteophytosis and mild intervertebral disc space narrowing in the lower thoracic and lumbar spine.  *Id.*  He had near-complete loss of intervertebral disc space height at L4-L5 and L5-S1 levels.  *Id.*

On November 5, 2012, Plaintiff's HSM-18 form was again modified to reinstate the work restrictions of sedentary work only.  (D.E. 97-1, pp. 172-178).

On November 7 and 8, 2012, Plaintiff sent two SCRs wanting to know the "extent of his injuries" and also requesting to see an orthopedist.  (D.E. 97-1, pp. 179-180).  Plaintiff was scheduled for a clinic visit on November 8, 2012 but he failed to show.  (D.E. 97-1, p. 181).

On November 15, 2012, Plaintiff was seen by the nursing staff at the GU infirmary.  (D.E. 97-1, p. 183-188).  Plaintiff rated his back pain a 4/10.  *Id.* at p. 184.  Upon examination, the nursing staff noted full flexion of Plaintiff's back but that he had difficulty sitting.  *Id.* at pp. 185, 186.  The plan was to refer Plaintiff to a provider.  *Id.* at p. 188.

On November 16, 2012, Plaintiff was seen via a telemed video by Nurse Sandra Smock for complaints of worsening chronic back pain.  (D.E. 97-1, pp. 189-194).  Plaintiff related that he had lost weight because on certain days he could not ambulate to the chow hall and that he often lost sleep due to back pain.  *Id.* at p. 189.  Plaintiff stated that he wanted to be transferred to a hospital unit.  *Id.*  Nurse Smock reviewed Plaintiff's medical records from a month prior and noted that Plaintiff had indeed lost ten pounds since October 23, 2012.  (D.E. 97-1, p. 190).  Plaintiff denied loss of bowel/bladder

control but admitted to difficulty stopping and starting urinary flow.  *Id.* at 189.  Plaintiff

was prescribed Ibuprofen, 600 mg, once a day, for a month, along with a higher calorie

diet. *Id.*

On November 21, 2012, Plaintiff filed a SCR complaining that he needed to see a

licensed doctor and not just a nurse or PA.  (D.E. 97-1, p. 200).

On November 26, 2012, Dr. Herrera gave a verbal order to discontinue Plaintiff's

hypercaloric diet.   (D.E. 97-1, p. 201).

On November 28, 2012, Plaintiff was seen by Nurse Practitioner (NP) O.

Ogunlade for complaints of continuing back pain.  (D.E. 97-1, pp. 203-215).  NP

Ogunlade reviewed Plaintiff's x-rays with him and reassured him that his BMI was

within normal limits.  *Id.* at p. 204.  NP Ogunlade increased Plaintiff's Ibuprofen to 800

mg per day and scheduled him to return in one week for a follow-up visit.  *Id.* at pp. 204-

205.

On December 6, 2012, Plaintiff was seen by Dr. Chang at the GU infirmary

complaining about dry skin, cold blisters, and back pain.  (D.E. 97-1, pp. 217-218).

Upon examination, Dr. Chang noted evidence of Plaintiff's past back surgery and

observed paraspinal muscle spasm, right greater than left; however, Plaintiff had no

problem getting on and off the exam table.  *Id.* at p. 217.  Plaintiff's deep tendon reflexes

were 2+ on the right knee, but were not elicited on the left knee or at either ankle.  *Id.*

Dorsiflexion of both great toes was normal.  *Id.*   Dr. Chang's assessment was nasal

congestion, dry skin, and chronic back pain status post surgery.  *Id.*  Dr. Chang's plan

was to start Plaintiff on an allergy/cold medication (Chlorpheniramine) and an

antihistamine (Loratadine), while continuing him on Ibuprofen, 800 mg twice a day, and Nortriptyline, 75 mg, once a night.  *Id.* at pp. 218-219.

On January 31, 2013, Plaintiff arrived at the Diboll Unit for Chronic Care of his dental abscesses and back /neck pain.  (D.E. 97-1, pp. 223-248).  At his initial work-up, lab work was run and he was seen by a chronic care provider, NP Laurie Montgomery. (D.E. 97-1, pp. 235-239).  Upon examination and review of his current medications, NP Montgomery discontinued all of Plaintiff's then current medications and prescribed Robaxin (Methocarbamol) 750 mg, 2 tabs per day, Meloxicam (an anti-inflammatory pain medication), 15 mg, and Penicillin.  (D.E. 97-1, pp. 239-242).  She also ordered x-rays of Plaintiff's cervical spine.  *Id.* at 239.

On February 12, 2013, Plaintiff reported to the Diboll infirmary for the results of his spinal x-rays.  (D.E. 97-1, pp. 249-250).  The x-rays revealed:

> Straightening of the cervical lordosis may be positional or due to muscle spasm.  Moderate spondylosis is noted at C5-C6 with intervertebral disc space loss, end plate sclerosis, and osteophytosis.  Mild degenerative changes are also seen at C6-C7.  The prevertebral soft tissues are within normal limits.

(D.E. 97-1, p. 250).  The diagnosis was chronic disc disease and Plaintiff was continued on Robaxin.  *Id.* at 251.

On April 8, 2013, Plaintiff was seen by PA Muldowney via telemed for complaints of chronic neck and back pain, and his request to be on Robaxin.  (D.E. 97-1, pp. 257-259).  PA Muldowney performed a limited clinical examination but found that Plaintiff was able to move from sitting to standing and vice versa with no symptoms of discomfort and support in a fluid movement; that he had good flexion and extension of

back and lower extremities, and good lateral bending and rotation of the back. *Id.* PA Muldowney found Plaintiff's symptoms consistent with common activity related disorders of the joints resulting from normal wear and tear. *Id.* PA Muldowney advised plaintiff that robaxin is prescribed for acute musculoskeletal strains and is not a chronic pain medication. *Id.* PA Muldowney also told Plaintiff that Robaxin was not medically indicated at that time and that he had been prescribed Mobic for his chronic pain. *Id.* Plaintiff did not have any symptoms indicating a need for a splint/back brace and he was advised that exercise might assist in pain management. *Id.*

   *Grievances.*

   On October 30, 2012, Plaintiff filed a Step 1 grievance, Grievance No. 2013036264, complaining that on September 13, 2011, he was involved in a heat-related slip and fall at Garza East Unit and that he injured his head, back, and neck, and required eight staples in his head. (D.E. 95-1, pp. 3-4). Plaintiff complained that he had never had neck issues prior to the fall and that PA Mendez refused to treat him for his upper back or neck pain and refused to schedule him to see a real doctor or an orthopedic surgeon. *Id.* at p. 3. Plaintiff complained further that the GU did not provide inmates with the appropriate information to determine the nature of their injuries or whether they were 100% disabled. *Id.* at p. 4.

   On December 3, 2012, Practice Manager Rudy Martisek denied Plaintiff's Step 1 grievance responding:

> You had medical examinations by Physicians Assistants on November 16 and 28, 2012. Your x-ray of October 24, 2012 was reviewed, and you were prescribed medication for pain. After your examination on

> November 28, the provider referred you to a doctor for additional examination.  Please take your medications as prescribed and submit a sick call request to medical if you have discomfort or questions.

(D.E. 95-1, p. 4).

On December 10, 2012, Plaintiff filed a Step 2 appeal of Grievance No. 2013036264.  (D.E. 95-1, pp. 5-6).  Plaintiff argued that a PA could not perform a physical examination or prescribe medication, and that "normal care was not practiced in any type of way or any ethical way or to the Standards of the Texas Medical Board." (D.E. 95-1, p. 5).

On February 25, 2013, Robert H. Kane, Jr., of the TDCJ Health Services Division, denied Plaintiff's appeal, noting:

> Review of the medical record indicates you slipped and fell on 9/13/2011.  You were taken to the community hospital for treatment at that time.  You were seen by the unit provider upon your return to the unit. Your staples were removed after 6 days as ordered.  You complained of muscle spasms to spine at that time.  You were prescribed Robaxin for 7 days.  Your next complaint regarding your back was 1/12/12.  You were seen for low back pain with a past medical history of surgical fusion to your spine.  You were seen again on 4/12/2012 by the physician for complaints of pain between your shoulder blades.  The physician documented [that] you were not compliant with the exam.  On 9/27/2012 the provider documented you requested a drop in your restrictions, stating your chronic pain had improved.  Your HSM-18 was updated to remove your work restrictions.  You came to the clinic again on 10/23/12 with pain to back due to your hardware.  X-rays ordered and you were given Robaxin x 7 days. You were seen on 11/5/2012 and your x-ray results were explained stating you had post surgical changes.  You were given work restrictions again. You were seen by the provider on 11/28/12 and asked to see the physician for complaints of progressively worse back pain.  You were scheduled and seen on 12/6/12 by the physician.  At that time, you were advised no changes were indicated to your treatment care plan.  You were seen by a different physician on 1/22/13 and no complaints regarding your back were documented at that time.  Most recently, you were seen by the provider on

2/12/13 where your x-rays were again reviewed with you.  You were given
Robaxin x7 days for back pain at that time.

(D.E. 95-1, p. 6).

## IV.   SUMMARY JUDGMENT STANDARD.

Summary judgment is proper if there is no genuine issue as to any material fact
and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A
genuine issue exists "if the evidence is such that a reasonable jury could return a verdict
for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
The Court must examine "whether the evidence presents a sufficient disagreement to
require submission to a jury or whether it is so one-sided that one party must prevail as a
matter of law."  *Id.* at 251-52.  In making this determination, the Court must consider the
record as a whole by reviewing all pleadings, depositions, affidavits and admissions on
file, and drawing all justifiable inferences in favor of the party opposing the motion.
*Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not
weigh the evidence, or evaluate the credibility of witnesses.  *Id.*  Furthermore, "affidavits
shall be made on personal knowledge, shall set forth such facts as would be admissible in
evidence, and shall show affirmatively that the affiant is competent to testify to the
matters stated therein."  Fed. R. Civ. P. 56(e); *see also Cormier v. Pennzoil Exploration
& Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider
affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*,
819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider
hearsay evidence in affidavits and depositions).   Unauthenticated and unverified

documents do not constitute proper summary judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

## V.     DISCUSSION.

### A.     42 U.S.C. § 1983.

Section 1983 provides a vehicle for redressing the violation of federal law by those acting under color of state law. *Nelson v. Campbell*, 541 U.S. 637, 643 (2004).

To prevail on a § 1983 claim, the plaintiff must prove that a person acting under the color of state law deprived him of a right secured by the Constitution or laws of the United States.  42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48 (1988).  A defendant acts under color of state law if he misuses or abuses official power and if there is a nexus between the victim, the improper conduct, and the defendant's performance of official duties. *Townsend v. Moya,* 291 F.3d 859, 861 (5th Cir. 2002).

"Personal involvement is an essential element of a civil rights cause of action." *Thompson v. Steele,* 709 F.2d 381, 382 (5th Cir. 1983).   There is no vicarious or *respondeat superior* liability of supervisors under section 1983.  *Thompkins v. Belt,* 828 F.2d 298, 303-04 (5th Cir. 1987).  *See also Carnaby v. City of Houston,* 636 F.3d 183, 189 (5th Cir. 2011) (the acts of subordinates do not trigger individual § 1983 liability for supervisory officials).  For a supervisor to be liable under § 1983, the plaintiff must show that (1) the supervisor failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the constitutional violation; and (3) the failure to supervise or train amounts to deliberate indifference to the plaintiff's constitutional rights. *Roberts v. City of Shreveport,* 397 F.3d 287, 292 (5th Cir. 2005).  Establishing a supervisor's deliberate indifference generally requires a plaintiff to demonstrate "at least a pattern of similar violations."  *Rios v. City of Del Rio, Tex.,* 444 F.3d 417, 427 (5th Cir. 2006) (citations omitted).

### B.     Plaintiff's Eighth Amendment conditions of confinement claims.

In his summary judgment response, Plaintiff attempts to reargue his Eighth Amendment conditions of confinement claims, previously raised against the TDCJ

Defendants, that the Garza East Unit was excessively hot and that the extreme temperatures caused or contributed to his fall in the restroom.  He contends now that the heat at the GU posed an unreasonable risk to his health and safety and that the UTMB-CMC Defendants knew or should have known of this unconstitutional condition.  (D.E. 103).  The UTMB-CMC Defendants did not move for summary judgment on these claims that were raised for the first time in Plaintiff's summary judgment response, but it is respectfully recommended that they be dismissed for failure to allege a constitutional violation.

The Eighth Amendment prohibits cruel and unusual punishment.  U.S. Const. amend. VIII.  Prison officials must provide humane conditions of confinement; ensure that inmates receive adequate food, clothing, shelter, and medical care; and take reasonable measures to guarantee the safety of the inmates.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  Conditions that result in "unquestioned and serious deprivations of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities" violate the Eighth Amendment.  *Hudson v. McMillian*, 503 U.S. 1, 8-10 (1992); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

The Supreme Court has developed a two-part analysis to govern Eighth Amendment challenges to conditions of confinement.  First, under the "objective component," a prisoner must prove that the condition he complains of is sufficiently serious to violate the Eighth Amendment.  *Hudson*, 503 U.S. at 8.  The challenged condition must be "extreme."  Id. at 9.  While an inmate "need not await a tragic event" before seeking relief," *Helling v. McKinney*, 509 U.S. 25, 33 (1993), he must at the very

least show that a condition of his confinement "pose[s] an unreasonable risk of serious damage to his future health" or safety. *Id.* at 35. Moreover, the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury will actually be caused by exposure to [the challenged condition of confinement]. *Id.* It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwilling to such a risk. *Id.* In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate. *Id.* at 36. The Eighth Amendment thus guarantees that prisoners will not be "deprive[d] ... of the minimal civilized measure of life's necessities." *Rhodes*, 452U.S. at 347.

Second, the prisoner must show that the defendant prison officials "acted with a sufficiently culpable state of mind" with regard to the condition at issue. *Hudson*, 503 U.S. at 8. The proper standard is that of deliberate indifference. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991). Negligence does not suffice to satisfy this standard, *id.* at 305, but a prisoner need not show that the prison official acted with "the very purpose of causing harm or with knowledge that harm would result." *Farmer*, 511 U.S. at 835. In defining the deliberate indifference standard, the Farmer Court stated:

[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of

facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837.  Furthermore, the official may escape liability for known risks "if [he] responded reasonably to the risk, even if the harm ultimately was not averted."  Id. at 844.

Plaintiff claims that there were broken pipes in Echo Dorm at the Garza East Unit, and it was hot in the dorms, and that these conditions contributed to his September 13, 2011 slip and fall and resulting injuries.  He argues that PA Mendez, Dr. Herrera and Mr. Murray knew of these conditions but failed to remedy them, in deliberate indifferent to his health and safety.  However, these allegations are without any factual support in the record.  The UTMB-CMC Defendants are not responsible for the physical building or maintenance of the prison.  In his original complaint, Plaintiff did not allege that the UTMB-CMC Defendants played any role in maintaining the GU dorms or temperature of the facility.  Indeed, as will be discussed in more detail below, when Plaintiff was taken to the infirmary following his slip and fall in the bathroom, he did not report to the medical staff that his fall was attributable to excessive heat.  (D.E. 97-1, p. 5, "Patient states was washing self in sink and slipped on water on floor.  Hit head on sink and fell back onto floor.").  Plaintiff made no allegation of excessive heat, let alone that the UTMB-CMC Defendants were somehow responsible for the temperature in his dorm.

In his summary judgment response, Plaintiff argues that he seeks additional discovery to prove his case, including the repair records of the broken pipes in Echo Dorm and the name of the contractor responsible for repairing the water main along the

new walkway at Garza East.  (D.E. 103, p. 1).  He also seeks the maintenance records for

Echo Dorm from July 2011 through September 30, 2011.  (D.E. 103, p. 1).  Plaintiff

states that this information will help establish "all Defendants' knowledge of and

complicity issue in the issue of heat related problems …".  (D.E. 103, p. 2).  This

argument is without merit.  Plaintiff's Eighth Amendment conditions of confinement

claims were dismissed against the TDCJ Defendants for failure to exhaust administrative

remedies finding that Plaintiff failed to raise these claims in his Step 1 or Step 2

grievances against Brad Livingston, Warden Pawelek, or Warden Givens.  (*See* D.E. 58,

p. 9).  Similarly, Plaintiff did not raise conditions of confinement claims against Dr.

Herrera, PA Mendez or Mr. Murray in his grievances.  (D.E. 95-1, pp. 3-6).  His claims

against the UTMB-CMC Defendants concern only the medical treatment he received

immediately after the September 13, 2011 fall and the months following thereafter.  *Id.*

Nothing in the summary judgment evidence or Plaintiff's pleadings suggests that any

UTMB-CMC Defendant had prior knowledge of any allegedly unsafe condition at the

Garza Unit, let alone had any authority to order maintenance or repair of such a

condition.  Therefore, to the extent Plaintiff is attempting to allege claims against the

UTMB-CMC Defendants regarding conditions of confinement, it is respectfully

recommended that those claims be dismissed for failure to state a constitutional violation.

### C.    Plaintiff's deliberate indifference to serious medical needs claims.

Plaintiff claims that Defendants were deliberately indifferent to his serious

medical needs following his September 13, 2011 slip and fall.  Defendants move for

summary judgment on the grounds of qualified immunity.  (D.E. 95, p. 4).  *See Mitchell*

*v. Forsyth,* 472 U.S. 511, 526 (1985) ("The [qualified immunity] entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.") (emphasis in original).

    **(1)    Qualified immunity.**

    The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  When a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc).  To discharge this burden, the plaintiff must satisfy a two-prong test."  *Atteberry v Nocana Gen. Hosp.,* 430 F.3d 245, 251-52 (5th Cir. 2005).  First the plaintiff must claim that the defendants committed a constitutional violation under current law.  *Id.* (citation omitted). Second, the plaintiff must claim that defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of.  *Id.*

    While it will often be appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and then determining whether the constitutional right was clearly established, that ordering of the analytical steps is no longer mandatory.  *Pearson*, 555 U.S. at 236 (receding from *Saucier v. Katz,* 533 U.S. 194 (2001)).

**Step 1: Violations of a constitutional right.**

Plaintiff claims that Defendants were deliberately indifferent to his serious medical needs concerning his slip and fall and follow-up medical treatment.

In order to state a § 1983 claim for denial of adequate medical treatment, a prisoner must allege the official(s) acted with deliberate indifference to serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 105 (1976); *Wilson v. Seiter*, 501 U.S. 294, 303.(1991); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). Deliberate indifference encompasses more than mere negligence on the part of prison officials. It requires that prison officials be both aware of specific facts from which the inference could be drawn that a serious medical need exists and then the prison official, perceiving the risk, must deliberately fail to act. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Unsuccessful medical treatment or a disagreement with the course of treatment provided does not constitute deliberate indifference. *Varnado,* 920 F.2d at 321.

Allegations of negligent medical care or medical malpractice do not constitute valid § 1983 claims. *Gobert v. Caldwell,* 463 f.3d 339, 346 (5th Cir. 2006). *See also Graves v. Hampton*, 1 F.3d 315, 319 (5th Cir. 1993) ("[i]t is well established that negligent or erroneous medical treatment or judgment does not provide a basis for a § 1983 claim."). As long as medical personnel exercise professional medical judgment, their behavior will not violate a prisoner's constitutional rights. *Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982). In fact, active treatment of a prisoner's serious medical condition does not constitute deliberate indifference, even if treatment is negligently administered. *See Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999). Deliberate

indifference "is an extremely high standard to meet." *Domino v. Texas Dep't of Crim. Justice,* 239 F.3d 752, 756 (5th Cir. 2001).

The uncontested summary judgment evidence establishes that PA Mendez, Dr. Herrera, and Mr. Murrary did not participate in any act or omission that violated Plaintiff's constitutional rights. To the contrary, Plaintiff's medical records reveal that he received prompt and appropriate medical attention immediately following his September 13, 2011 slip and fall, and continued to receive adequate care in the coming months and years.

On September 13, 2011, Plaintiff was brought to the GU infirmary after he had fallen in the restroom and suffered a laceration to the back of his head. (D.E. 97-1, pp. 4, 11). The nursing staff contacted PA Mendez who ordered that Plaintiff be transferred to the local ER for evaluation. (D.E. 97-1, pp. 4, 11). A CT scan was performed and the results showed no acute intracranial abnormality. (D.E. 97-1, p. 31). Plaintiff was diagnosed with a concussion with LOC, a laceration to the head that required seven staples, and a neck sprain/strain. (D.E. 97-1, p. 24). The Christus Spohn ER prescribed Plaintiff Ibuprofen three times a day for pain, and he was transferred back to the GU. (D.E. 97-1, p. 24). After the staples were removed from Plaintiff's scalp, Plaintiff began complaining about neck and back pain, and, as evidenced by his medical record, he was repeated seen by GU medical staff, prescribed appropriate medications, seen via telemed appointments, and eventually transferred to the Diboll Unit. His HSM-18 form reflected his appropriate restrictions.

*Claims against PA Mendez.*

Plaintiff complains that PA Mendez was deliberately indifferent to his serious medical needs because he performed duties that were beyond his expertise and training, prescribed and changed Plaintiff's medications without supervision, and refused Plaintiff access to a licensed physician or specialist.  (D.E. 11, pp. 6-7; D.E. 103, pp. 4, 12).  In opposition to Plaintiff's allegations, PA Mendez offers the affidavit of Dr. Steven Bowers, the legal coordinator for UTMB-CMC who has reviewed Plaintiff's medical records and his claims against PA Mendez.  (D.E. 97-2, Bowers Aff't at pp. 4-10).  Dr. Bowers summarizes the cause of Plaintiff's neck pain as "moderate degenerative changes in the cervical spine which are normal given Mr. Davis' age."  (D.E. 97-2, Bowers Aff't at p. 10).  Plaintiff's cervical X-rays did not reveal any acute condition evidencing an injury suffered from a fall on September 13, 2011.   (D.E. 97-2, Bowers Aff't at p. 10).  In fact, Dr. Bowers finds no medical indication that warranted a referral to an orthopedic specialist or surgeon, an MRI, or a CAT-Scan.  *Id.*  Plaintiff's mere allegation that PA Mendez should have referred him to an orthopedic specialist or physician is merely a dispute with the type of treatment PA Mendez provided, and is not actionable.  *Norton v. Dimazana,* 122 F.3d 286, 292 (5th Cir. 1997) (disagreement with medical treatment provided does not state an Eighth Amendment claim for deliberate indifference to serious medical needs).

Plaintiff also alleges that PA Mendez discontinued his Nortriptyline and, after Plaintiff complained and requested refills, PA Mendez decreased the dosage.  As to this claim, Dr. Bower points out that Plaintiff had been prescribed Nortriptyline (Pamelor) to

help him sleep, but that the prescription had expired in November 2011.  (D.E. 97-2, Bowers Aff't at p. 5).  On January 13, 2012, Plaintiff was then seen by PA Mendez for complaints of neck and back pain and he related that his pain prevented him from sleeping well and that the Nortriptyline had helped.  (D.E. 97-1, p. 73).  PA Mendez prescribed Nortriptyline 50 mg.  *Id.*  Dr. Bowers testifies that this prescribed pain medication was appropriate treatment for Plaintiff's complaint of chronic neck and back (D.E. 97-2, Bowers Aff't at p. 10).  To the extent Plaintiff received a higher dosage in the past or wanted a higher dosage at that time is, again, merely a disagreement with the treatment Plaintiff did receive, and does not amount to deliberate indifference.  *Norton,* 122 F.3d at 292.  *See also Witt v. Bell,* 551 Fed. Appx. 240, 240-41 (5th Cir. 2014) (per curiam) (affirming dismissal at § 1915A screening of medical claim that non-physician defendants were not qualified to treat broken toe where defendants saw plaintiff four times over a two-week period and prescribed over-the-counter pain medication).

Plaintiff claims that PA Mendez rendered medical treatment and care that was beyond his level of expertise.  Plaintiff fails to offer any summary judgment evidence as to what medical services a PA can perform versus a licensed doctor, nor does he claim that he suffered any injury as a consequence of PA Mendez performing those duties.  In addition, Dr. Bowers offers his uncontroverted opinion as a medical doctor that PA Mendez "did not perform any medical care or duties outside the purview of his licensure."  (D.E. 97-2, Bowers Aff't at p. 11).  Dr. Bowers also notes that Plaintiff was treated by other medical professionals and that these providers reached the same diagnoses and prescribed the same course of action as did PA Mendez.  *Id.*  Plaintiff fails

to establish that PA Mendez knew of an excessive risk to Plaintiff's serious medical needs and then ignored that risk.  *Estelle,* 429 U.S. at 104-05.  Thus, Plaintiff fails to state a cognizable Eighth Amendment claim against PA Mendez.

*Dr. Herrera.*

Plaintiff claims that Dr. Herrera did not have any regard for the betterment of his patient's welfare, and that he failed to put Plaintiff's health before the needs of the TDCJ. (D.E. 11, p. 5).  In his summary judgment response, Plaintiff argues that Dr. Herrera failed to inform Plaintiff of the exact nature of his injuries, delayed seeing him for two months, and that, because he "speaks broken English pretty badly," never fully understood Plaintiff's complaints.  (D.E. 103, pp. 9-10).

The medical record shows that Plaintiff was personally evaluated by Dr. Herrera on April 12, 2012, for complaints of a constant pain between shoulder blades, neck, and lower back over the last ten years.[5]  (D.E. 97-1, p. 131-32).  Ten days before, Plaintiff was seen by PA Mendez who had increased Plaintiff's Nortriptyline from 50 mg to 75 mg, and who also prescribed Naproxen, 500 mg, once a day.  (D.E. 97-1, p. 117).  Dr. Herrera noted that Plaintiff had ambulated to the appointment without assistance and was oriented and alert.  (D.E. 97-1, p. 131).  However, Dr. Herrera found Plaintiff to be uncooperative during his examination such that he could not exam him properly.  *Id.*  Dr.

---

[5] Plaintiff had previously submitted numerous SCRs seeking to see a medical doctor rather than a PA or nurse for his chronic pain, but although he was often scheduled for appointments, he either refused to attend or was a no show, and therefore, he was not seen by Dr. Herrera until April 12, 2012.  (*See* D.E. 97-1, pp. 54, 55, 61, 62, 67, 70, 75, 87, 88).

Herrera's assessment was degenerative disc disease of the lumbar spine and he continued Plaintiff on the Nortriptyline and Naproxen as prescribed by PA Mendez.  *Id.*

Dr. Bowers has reviewed Plaintiff's medical records and testifies that, based on his education, training and experience, Dr. Herrera's actions were comparable to that of "any reasonably well trained physician," that such care was provided in good faith, and that Plaintiff received appropriate care.  (D.E. 97-2, Bowers Aff't at p. 11).   To the extent Plaintiff complains that there was a delay in his being seen by Dr. Herrera, Plaintiff fails to offer any evidence to suggest that Dr. Herrera was responsible for scheduling patients or that he received a SCR.  Moreover, there is no evidence to suggest that any delay in being seen by Dr. Herrera caused him any injury.  To the contrary, Plaintiff reported that he had been suffering from chronic neck and back pain for over ten years.  (D.E. 97-1, p. 131).  His October 29, 2012 X-rays confirmed the physical examination diagnosis of degenerative disc disease.  (D.E. 97-1, pp. 170-71).  There are no facts to suggest that Dr. Herrera knew of an excessive risk to Plaintiff's serious medical needs and then ignored that risk, and as such, Plaintiff fails to state a cognizable constitutional violation against Dr. Herrera.

*Mr. Murray.*

Plaintiff claims that Mr. Murray was deliberately indifferent to his serious medical needs because "by title, office and position, [he] had a responsibility to assure that all patients were receiving the medical care and treatment chronic care inmates needed or required to address their needs by requesting their medical records to review their history."  (D.E. 11, p. 3).

As previously noted, section 1983 does not create supervisory or *respondeat superior* liability. *Oliver v. Scott,* 276 F.3d 736, 742 (5th Cir. 2002). Mr. Murray did not personally treat Plaintiff, and Plaintiff does not contend that Mr. Murray denied or delayed treatment ordered by the medical staff. Plaintiff argues that he was not given copies of his medical records and diagnoses at the time he was seen, and he argues that the Christus Spohn ER physician, Dr. Batki, incorrectly diagnosed him with a neck sprain/strain at the time of his fall. He suggests that, had he seen this diagnosis earlier, he would have known that the GU medical staff was failing to treat him for his injuries.

This argument is nonsensical. The fact that Plaintiff's subsequent X-rays revealed degenerative disc disease does not equate with a finding that he was incorrectly treated for a mere neck sprain/strain. Indeed, the medical staff was well aware of Plaintiff's past lumbar surgery, and prior to even obtaining X-rays, Dr. Herrera diagnosed Plaintiff with degenerative disc disease. (D.E. 97-1, p. 131). Whether or not Plaintiff had access to certain medical reports did not prevent him from seeing medical staff, detailing his symptoms, and being treated accordingly. Plaintiff fails to state a constitutional violation against Mr. Murray.

**Step 2 – Objective reasonableness.**

Defendants argue that, even if the Court were to find Plaintiff's constitutional rights were violated, they are entitled to qualified immunity because their actions were objectively reasonable in light of the law that was clearly established at the time of the events forming Plaintiff's lawsuit. *Anderson,* 483 U.S. at 639-40; *Freeman v. Gore,* 483 F.3d 404, 410-11 (5th Cir. 2007). The second step in the qualified immunity analysis is

best understood as two distinct inquiries: (1) what was the clearly established law at the time Plaintiff was receiving medical treatment at the GU; and (2) were Defendants' actions objectively reasonable in light of that clearly established law?  *See Hare v. City of Corinth, Miss.,* 135 F.3d 320, 326 (5th Cir. 1998).  At the summary judgment stage, a plaintiff must present evidence to raise a fact issue "material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law and facts available to them."  *Lampkin v. City of Nacogdoches,* 7 F.3d 430, 435 (5th Cir. 1993).

It was well established law on the day Plaintiff fell, September 13, 2011, and thereafter, that to establish a claim for deliberate indifference to serious medical needs a plaintiff must show that the defendant knew of and disregarded and excessive risk to inmate health or safety.  *Farmer,* 511 U.S. at 837.  The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he also must draw that inference.  *Id.*  Plaintiff's medical records defeat Plaintiff's claims that any Defendant failed to act reasonably.  Following his September 13, 2011 fall, Plaintiff was seen repeatedly in the GU infirmary for complaints of neck and back pain.  He was prescribed pain medication, muscle relaxants and anti-inflammatory medications, and when he complained about the dosage, it was increased. His SCRs were also answered promptly and he was frequently scheduled to see a provider, although he often was a "no show" for a scheduled appointment or refused to attend or cooperate.  Indeed, in September 2012, Plaintiff reported that he was feeling better and he asked to have certain restrictions removed from his HSM-18, and PA

Mendez complied.   (D.E. 97-1, pp. 158-59).   After he received his October 2012 radiology report, Plaintiff then sought to have the restrictions reinstated, and that was also done.  (D.E. 97-1, pp. 170-72).  Plaintiff requested to be transferred to a "medical unit," but he did not meet the criteria for inpatient (infirmary) placement.  (D.E. 97-2, Bowers Aff't at p. 11).  Defendants' actions were objectively reasonable under established Eighth Amendment law.

### D.   Retaliation claim.

Plaintiff claims that PA Mendez retaliated against after he slip and fell by removing his medications prescribed by another physician.  (D.E. 11, p. 6).

To state a valid § 1983 claim for retaliation, "a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation."  *Jones v. Greninger*, 188 F.3d 322, 324-25 (5th Cir. 1999) (citing *McDonald v. Stewart*, 132 F.3d 225, 231 (5th Cir. 1998).  An inmate must allege more than his personal belief that he is the victim of retaliation.  *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997) (citation omitted).   Mere conclusory allegations of retaliation will not withstand a summary judgment challenge.  *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995).

The purpose of allowing retaliation claims under § 1983 is to ensure that prisoners are not unduly discouraged from exercising their constitutional rights.  *Morris v. Powell*, 449 F.3d 682, 686 (5th Cir. 2006).   However, some acts, even though they may be motivated by retaliatory intent, are so *de minimis* that they would not deter the ordinary person from further exercise of his rights.  *Id.*   Such acts do not rise to the level of

constitutional violations and cannot form the basis of a § 1983 claim.  *Id.*  For example, a job transfer from the commissary to the kitchen might be *de minimis*, while a transfer to a more dangerous unit might constitute an adverse retaliatory act.  *Id.* at 687.

Plaintiff has failed to offer any evidence of motivation to suggest why PA Mendez would discontinue a particular medicine, and notes indicate that the prescription had simply expired on 11/11.  (D.E. 97-1, p. 73).  When Plaintiff saw PA Mendez on January 13, 2012 and requested that he be prescribed Nortriptyline to help him sleep, PA Mendez did so.  (D.E. 97-1, p. 72).  To the extent Plaintiff argues that this dosage of Nortriptyline was less than what he was prescribed in the past, he fails to demonstrate that, but for exercising a protected constitutional right, he would have been prescribed a higher dose of the medication.   To the contrary, although PA Mendez subsequently increased the dosage to 75 mg, subsequent providers did not raise the dosage above that amount.  Plaintiff fails to establish that but for PA Mendez' retaliatory intent, he would not have been prescribed a higher dosage of Nortriptylene, and therefore, he fails to state an actionable claim of retaliation.  Thus, it is respectfully recommended that PA Mendez be granted summary judgment in his favor, and that Plaintiff's retaliation claim against him be dismissed with prejudice.

## VI.    RECOMMENDATION.

Defendants have demonstrated that there is no genuine issue of a material fact that they did not violate Plaintiff's Eighth Amendment rights.  Accordingly, it is respectfully recommended that the Court grant Defendants' motion for summary judgment (D.E. 95)

and dismiss with prejudice Plaintiff's claims against Defendants.  It is further respectfully recommended that all pending motions be denied as moot.

Respectfully submitted this 14th day of September, 2015.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United* Servs. *Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).